IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ANGELA JOHNSON,                        )
                                       )
            Plaintiff,                 )
                                       )
     v.                                )          1:09CV37
                                       )
AMERICAN UNITED LIFE                   )
INSURANCE COMPANY,                     )
                                       )
            Defendant.                 )

**MEMORANDUM OPINION AND ORDER**

**AULD, Magistrate Judge**

Plaintiff, Angela Johnson, brought this action to recover
benefits against Defendant, American United Life Insurance Company,
pursuant to the Employee Retirement Income Security Act ("ERISA"),
29 U.S.C. § 1132(1)(B).  (Docket Entry 1 at 1.)  Specifically,
Plaintiff contends Defendant wrongfully denied her claim to
accidental death payments as the beneficiary of her late husband's
employer-based group insurance policies.  (Id. at 1-4.)  The
parties have filed cross-motions for summary judgment (Docket
Entries 18 and 20), which both involve questions regarding whether
the single-car crash that resulted in the death of Plaintiff's
husband qualifies as an "accident" under the relevant policies.
For the reasons that follow, Plaintiff's Motion for Summary

Judgment (Docket Entry 20) will be denied and Defendant's Motion

for Summary Judgment (Docket Entry 18) will be granted.[1]

FACTS[2]

The Insurance Policies

Plaintiff's late husband, Richard Andrew Johnson II,

participated in an employee welfare benefit plan through his

employer. (Docket Entry 19 at 1; Docket Entry 21 at 2.) Said

employer contracted with Defendant to provide certain insurance

benefits in connection with that plan. (Id.) Under this

arrangement, in the event of the death of a participating employee

(such as Mr. Johnson), Defendant agreed to pay the employee's

beneficiary (here, Plaintiff) life insurance proceeds and a further

payment for accidental death, subject to certain terms. (Id.)

---

[1] The parties agreed to disposition by a United States
Magistrate Judge under 28 U.S.C. § 636(c)(1). (Docket Entry 30.)

[2] The facts recited herein reflect matters not disputed by the
parties. In support of their respective summary judgment motions,
the parties each attached as exhibits to their principal briefs
identical, Bates-stamped copies of the "Administrative Record"
compiled by Defendant in connection with Plaintiff's claim for
benefits. (Docket Entry 19, Ex. A; Docket Entry 21, Ex. A.)
Plaintiff previously had stipulated "that the disposition of this
action will be based solely on the administrative record." (Docket
Entry 15 at 1.) For clarity, parenthetical citations to the
Administrative Record use the convention "AR#" (with # referring to
the Bates-stamp number on the cited page(s)). Several documents
appear more than once in the Administrative Record. For example,
Mr. Johnson's employer-paid policy appears at AR 110-45, as well as
AR 322-57, and his employee-paid policy (which contains many, but
not entirely, overlapping provisions) appears at both AR 147-208
and 359-420. Citations herein generally correspond to the first
location of the cited document(s) within the Administrative Record.

Through his employment, Mr. Johnson acquired two distinct policies insured by Defendant: (1) an employer-paid policy (in effect from 2006) that provided $25,000 in life insurance proceeds and $25,000 as an accidental death payment (AR 110-45[3]); and (2) an employee-paid policy (in effect from 2003) that allotted $100,000 for life insurance and $100,000 for accidental death (AR 147-208[4]).

Under the heading "SECTION 12 – ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT," both policies contain this language:

> If a Person has an accident while insured under this policy which results in a loss shown below, [Defendant] will pay the amount shown opposite the loss if:
>
> 1) the loss occurs within 90 days from the date of the accident; and
>
> 2) [Defendant] receives acceptable proof of loss.
>
> FOR ACCIDENTAL LOSS OF                AMOUNT PAYABLE
> Life                                  Principal Sum
>
>         . . .
>
> LIMITATIONS
>
> Benefits are not payable for loss due directly or indirectly to:

---

[3] Said policy sets out three "Classes" of coverage with differing payouts depending on the employee's job. (AR 112, 114, 116.) At his death, Mr. Johnson fell in the class to which the $25,000 benefit figure(s) applied. (AR 259.)

[4] Said policy does not document the dollar figures elected by Mr. Johnson for life insurance proceeds and accidental death payment, but other documents confirm that he opted for coverage of $100,000 as to each. (AR 259, 311.)

1) suicide or attempted suicide, whether sane or insane;

2) air travel as a crew member;

3) participation in a riot or from war or an act of war, whether declared or undeclared;

4) commission of an assault or felony;

5) the voluntary taking of:

    a) a prescription drug in a manner other than as prescribed by a physician;

    b) any other federally- or state-controlled substance in an unlawful manner;

    c) non-prescription medicine, in a manner other than as indicated in the printed instructions; or

    d) poison, except accidental ptomaine poisoning;

6) the voluntary inhaling of gas (unless due to occupational accident); or

7) sickness other than infection occurring as a result of accidental injury.

(AR 132-33 (emphasis added); AR 176-77 (emphasis added).)[5]

Another page of "Section 12" within both policies states (under the sub-heading "DEFINITIONS"): "ACCIDENTAL DEATH means death due to an accident, directly and independently of all other causes." (AR 131; AR 175.) The parties agree that neither policy defines "accident." (Docket Entry 19 at 4; Docket Entry 21 at 8.)

"Section 12" of the employee-paid policy contains a page absent from "Section 12" of the employer-paid policy; it states:

BENEFIT

[Defendant] will pay an additional accidental death benefit, called the Seat Belt Benefit, if a person dies

---

[5] The employee-paid policy uses periods after numerals rather than closed parentheses and has an "or" after "Limitation" seven (not six), followed by this language (absent from the employer-paid policy): "8. participation in hang-gliding, bungee-jumping, automobile racing, motorcycle racing, skydiving, rock climbing, or mountain climbing." (AR 177.) The employee-paid policy alone has this "SECTION 14 – SUICIDE LIMITATION":

LIMITATION: If the Person commits suicide, while sane or insane:

1.  within two (2) years from the effective date of Personal Insurance, the benefits payable will be limited to the premiums paid; or

2.  two (2) or more years after effective date of Personal Insurance, but within two (2) years of the effective date of an increase in the amount of coverage previously obtained, the benefits payable will be limited to the coverage obtained prior to the effective date of the increase, if any, plus the premiums paid for the increased coverage.

(AR 181.)

as a result of an Automobile accident while properly wearing a Seat Belt at the time of the accident. . . .

LIMITATION

This benefit will not be paid if the Person, while operating the Automobile, was legally intoxicated as defined by applicable laws, violating traffic laws, racing, stunt-driving, or engaging in other similar activity during the accident.

In addition to the above limitation, this benefit is subject to the further limitations and provisions of this [Accidental Death and Dismemberment] section.

(AR 178.)

Both the employer- and employee-paid policies contain this clause: "CONFORMITY WITH STATE LAWS: Any provision of this [/the] policy in conflict with the laws of the state in which it is delivered is amended to conform to the minimum requirements of those laws." (AR 139; AR 202.) Mr. Johnson resided in North Carolina and his employer was located there. (AR 99, 321.) Finally, the parties agree that the policies do not grant discretionary authority over benefit determinations to Defendant. (Docket Entry 19 at 9; Docket Entry 21 at 6.)

<u>The Insured's Death</u>

A "South Carolina Traffic Collision Report Form" reflects that, at 1:48 a.m., on August 2, 2007, a South Carolina Highway Patrol trooper was "[n]otified" of an incident along southbound United States Highway 17 near North Myrtle Beach. (AR 100.) The trooper arrived at the scene eight minutes later and found that,

about the time of the dispatch, a pickup truck had "traveled off the roadway, struck a highway sign, and overturned several times." (AR 100.)[6] The trooper discovered Mr. Johnson, the driver and sole occupant, partially ejected from the truck and fatally injured. (AR 100-01.) Mr. Johnson had not employed a seat belt. (AR 101.)

According to the form, Mr. Johnson "was traveling too fast for conditions," with an "Estimated Speed" of 65 miles per hour in an area with a "Speed Limit" of 50 miles per hour. (AR 100.) "Prior to [i]mpact," the truck was moving "[e]ssentially [s]traight [a]head." (AR 101.) The trooper reported the "Weather Condition" as "Clear (no adverse conditions)," the "Light Condition" as "Dark (Street Lamp Lit)," and the "Road Surface Condition" as "Dry." (Id.) He identified "Driving Too Fast for Conditions" and "Ran off Road" as "Contributing Factors." (Id.) The truck, which belonged to Mr. Johnson's employer, incurred $20,000.00 in damage. (AR 100.) The traffic sign, property of the South Carolina Department of Transportation, received damage assessed at $500.00. (Id.)

The Horry County Coroner completed a "State of South Carolina, Department of Health and Environmental Control, Certificate of Death" as to Mr. Johnson. (AR 99.) It confirms that Mr. Johnson

---

[6] The truck veered slightly rightward from its lane of travel off the highway. (AR 100-01.) The trooper described the highway from which the truck departed as: "Two-way, Divided, Unprotected Median." (AR 101). The truck left the highway in a section of road characterized as: "Curve - On Grade." (Id.)

was "pronounced dead" on August 2, 2007, at 1:58 a.m., that he was "Dead on Arrival" at the hospital, and that the "Place of Death" was "car wreck/road." (Id.) Under the heading "Cause of Death," the Certificate of Death identifies "Internal Injuries" as the "Immediate Cause (Final disease or condition resulting in death)" and "MVA" as a condition "leading to" the Immediate Cause. (Id.) It further states "Victim lost control of vehicle, striking pole" under the heading "Describe How Injury Occurred." (Id.)

A "South Carolina Law Enforcement Division, Forensic Services Laboratory Report" dated September 11, 2007, reflects that the Horry County Coroner submitted "Blood" and "Ocular fluid" from Mr. Johnson for a toxicology examination in connection with the incident on August 2, 2007. (AR 92-93.) Said examination revealed that Mr. Johnson's blood had an "Ethanol" level of .289% weight/volume and his ocular fluid had an "Ethanol" level of .311% weight/volume. (Id.) The report lists "Negative" findings as to the other ten substances for which examination occurred. (Id.)

The Benefit Claims Process

Mr. Johnson's employer made a timely insurance claim for Plaintiff. (AR 83.) Defendant promptly paid Plaintiff $125,000 in life insurance proceeds from Mr. Johnson's policies. (AR 96-97.) On October 9, 2007, however, Defendant informed Plaintiff that:

> Based upon the police and medical reports provided to [Defendant], [Mr.] Johnson had a sufficient quantity of intoxicants in his system to make him lose control of his

-8-

mental and physical faculties at the time of his fatal collision. Therefore, benefits are not payable under the accidental death and dismemberment provisions of the policy.

(AR 80-81.)[7]  In support of this position, the letter specifically references reports by the American Medical Association and the National Highway Traffic Safety Administration documenting the negative effect alcohol consumption has upon driver performance, including the fact that "there is serious deterioration at [a blood alcohol ('BAC') level of] .08 . . . [and] [a]s BAC increases, the degree of impairment also rises dramatically."  (AR 80.)[8]

---

[7] The letter also addresses the "Seat Belt Benefit" in Section 12 of the employee-paid policy, noting its limitation "if the person, while operating the Automobile, was legally intoxicated as defined by applicable laws," and stating that "[n]o benefit is due because Mr. Johnson was legally intoxicated as defined by South Carolina law."  (AR 81.)  South Carolina makes it a crime "for a person to drive a motor vehicle within th[e] State while his alcohol concentration is eight one-hundredths of one percent or more."  S.C. Code Ann. § 56-5-2933(A).

[8] The Administrative Record also contains a document from the National Commission Against Drunk Driving bearing hand-written marks around the descriptions of "BLOOD-ALCOHOL CONCENTRATION[S]" of "0.18-0.30" and "0.25-0.40," respectively denominated as the "Confusion" and "Stupor" "STAGE[S] OF ALCOHOL INFLUENCE."  (AR 277.)  The "CLINICAL SIGNS/SYMPTOMS" listed for the former are: (1) "Disorientation, mental confusion; dizziness"; (2) "Exaggerated emotional states (fear, rage, grief, etc.)"; (3) "Disturbances of vision (diplopia, etc.) and of perception of color, form, motion, dimensions"; (4) "Increased pain threshold"; (5) "Increased muscular incoordination; staggering gait; slurred speech"; and (6) "Apathy, lethargy."  (AR 277.)  The symptomology list for the latter consists of:  (1) "General inertia; approaching loss of motor functions"; (2) "Markedly decreased response to stimuli"; (3) "Marked muscular incoordination; inability to stand or walk"; (4) "Vomiting; incontinence of urine and feces"; and (5) "Impaired consciousness; sleep or stupor."  (AR 277-78.)

Defendant offered "to reevaluate the eligibility for Accidental Death and Dismemberment benefits," if Plaintiff had "documents that indicate a different result," and advised Plaintiff of her right to appeal the determination administratively. (AR 81.) Mr. Johnson's employer then sent a letter to Defendant "to appeal the decision to decline coverage of the Accidental Death and Dismemberment benefit for [Mr.] Johnson . . . ." (AR 73.) As the basis for the appeal, the letter asserts that "being intoxicated by alcohol is not listed as a limitation under the AD&D benefit. The only reference to a limitation for legal intoxication appears on the following page and appears to apply to the seat belt benefit exclusively." (Id.) The letter was copied to Plaintiff. (Id.)

On December 14, 2007, Defendant sent a letter to Plaintiff (copied to Mr. Johnson's employer) that: (1) states Defendant found the employer's letter deficient for lack of documentation; (2) repeats and elaborates on the grounds stated in the initial denial letter;[9] (3) cites for the first time the limitation for "loss due directly or indirectly to commission of an assault or felony"; and (4) reiterates the options for reconsideration and/or

_____

[9] In this regard, Defendant cited an additional study from the National Highway Traffic Safety Administration for the proposition that "the typical effects experienced by a person with a BAC of .15 is [sic] less muscle control, vomiting, and major loss of balance. The predictable effect on driving is substantial impairment in vehicle control, attention to driving task, and in necessary visual and auditory information processing." (AR 68.)

appeal.  (AR 67-72.)  Two months later, counsel for Plaintiff wrote

to Defendant to appeal the benefits determination.  (AR 59-60.)

Plaintiff's counsel subsequently expanded his legal arguments

challenging the denial of benefits, including as follows:

> [Defendant] bases its decision on the fact that driving
> under the influence of alcohol is not an accident.  If
> case law were relevant, the meaning of the word
> "accident" is determined by the analysis set forth in
> *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077
> (1st Cir. 1990).  *Wickman* says:
>
>> One must ask whether a reasonable person, with
>> background and characteristics similar to the
>> insured, would have viewed the injury as
>> highly likely to occur as a result of the
>> insured's intentional conduct.
>
> *Id.* at 1088.
>
> . . .  The only thing that is highly likely to occur as
> a result of the insured's conduct, is that one will be
> arrested for drinking and driving.  Therefore, if case
> law were relevant, Mr. Johnson's death still would have
> been accidental pursuant to his life insurance policy
> because the probability of arrest greatly outweighs the
> probability of death.

(AR 29.)

Via further exchange of letters, Plaintiff's administrative

appeals were exhausted (AR 12-14, 19-25) and Defendant issued its

final decision declining to pay accidental death benefits (AR 3-8).

The final decision letter repeats Defendant's initial rationale and

references the previously-cited studies.  (AR 4-6.)  Further, as it

had in prior exchanges with Plaintiff's counsel (see, e.g., AR 19-

20), Defendant explained its determination by reference to

decisions employing the "Wickman standard," including <u>Eckelberry v.</u> <u>Reliastar Life Ins. Co.</u>, 469 F.3d 340 (4th Cir. 2006).  (AR 3-4.)[10] As part of that explanation, Defendant stated:

> The record in this case establishes that [Mr. Johnson] broke the law by driving with a blood-alcohol level more than three times the legal limit, knowing his drunk and severely impaired driving created a significant risk of bodily harm or death to others and to himself, and the precautions which would eliminate or reduce this risk (e.g., taking a taxi, or staying at a nearby hotel or with a friend) involved burdens so slight relative to the magnitude of the risk as to demonstrate [Mr. Johnson's] indifference to the risk.

(AR 4.)[11]  This litigation followed.

DISCUSSION

As the parties note (Docket Entry 19 at 8-9; Docket Entry 21 at 5-6), because the policies at issue did not reserve decision-

---

[10] As noted above, Plaintiff's counsel also had asserted that application of <u>Wickman</u>'s analytical model supported Plaintiff's position.  (<u>See</u> AR 29.)

[11] Elsewhere in the letter, Defendant went further, asserting that Mr. Johnson's "traveling off the roadway, striking a sign, and overturning the vehicle causing over $20,500 in damages was a voluntary and <u>intentional act</u> and thus not accidental."  (AR 6 (emphasis added).)  In other places, however, Defendant indicated that the crash was reasonably foreseeable, rather than intended.  (AR 6-8.)  Finally, Defendant developed its position that the "assault or felony" limitation foreclosed accidental death benefits as follows:  "[R]eports indicate [Mr. Johnson] . . . caus[ed] over $20,000 in damages to the vehicle and $500.00 in property damage. The report does not indicate the vehicle or other property damaged was owned by [Mr. Johnson] . . . [and thus his actions] would be considered . . . [a] felony under South Carolina law . . . ."  (AR 5.)  Defendant continued to rely on this limitation in its brief opposing Plaintiff's summary judgment motion (<u>see</u> Docket Entry 23 at 14), but not its brief supporting its summary judgment motion (<u>see</u> Docket Entry 19).

making discretion for Defendant, this Court reviews de novo Defendant's refusal to pay accidental death benefits.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). "[C]ourts conducting de novo review of ERISA benefits claims should review only the evidentiary record that was presented to the plan administrator or trustee except where the district court finds that additional evidence is necessary for resolution of the benefit claim."  Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1026-27 (4th Cir. 1993).  Neither party seeks to produce more evidence.  (See Docket Entry 28 at 3 (citing Quesinberry in support of joint motion to excuse pretrial filings).)  Indeed, Plaintiff has stipulated "that the disposition of this action will be based solely on the administrative record."  (Docket Entry 15 at 1.)

"[When] applying the de novo standard of review . . ., the issue is whether [the administrator] was correct in deciding [that the claimant should not receive] benefits."  Wilczynski v. Kemper Nat'l Ins. Cos., 178 F.3d 933, 934-35 (7th Cir. 1999); accord Urso v. Prudential Ins. Co. of Am., 532 F. Supp. 2d 292, 302 (D.N.H. 2008) ("De novo review requires the court to determine whether or not the administrative decision was correct . . . ."); Andrus v. AIG Life Ins. Co., 368 F. Supp. 2d 829, 832 (N.D. Ohio 2005) ("Under a de novo review, my role is to determine whether the plan administrator was correct in denying the plaintiff benefits.").  Defendant contends it should receive summary judgment because it

properly determined that Mr. Johnson's death failed to qualify as a loss from an "accident" as required by the policies at issue. (Docket Entry 19 at 1-2.)  Conversely, Plaintiff asserts that Defendant wrongly denied the subject benefits because it employed an improper definition of "accident."  (Docket Entry 22 at 1-2.)

In this regard, Defendant focuses on what it describes as the federal common law definition of "accident" adopted by <u>Eckelberry</u> (Docket Entry 19 at 11-18), whereas Plaintiff seeks to define "accident" by extracting portions of certain dictionary entries and by relying on various canons of contract construction (rather than relying on a <u>Wickman</u>-based analysis) (Docket Entry 21 at 8-14). The Court concludes that, although the arguments and authorities presented by the parties in pressing the foregoing points have some significance in determining the meaning of "accident" in the policies at issue, the Court first must analyze the inter-play between ERISA and North Carolina law.

<u>ERISA Preemption and N.C. Gen. Stat. § 58-3-30</u>

This case turns on the meaning of the term "accident" in Mr. Johnson's policies.  As those policies' "conformity with state laws" clause recognizes, the delivery of said policies in North Carolina requires their terms to conform to North Carolina law, including the requirement that, for all "group life, group accident, group health, and group accident and health insurance policies" issued after October 1, 1989 (like these policies), the

-14-

terms "'[a]ccident', 'accidental injury', and 'accidental means' shall be defined to imply 'result' language and shall not include words that establish an accidental means test." N.C. Gen. Stat. § 58-3-30. If ERISA does not preempt § 58-3-30, said statute thus controls the meaning of "accident" in Mr. Johnson's policies.

"ERISA comprehensively regulates, among other things, employee welfare benefit plans that, 'through the purchase of insurance or otherwise,' provide medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability, or death." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 44 (1987) (quoting 29 U.S.C. § 1002(1)). It contains "three provisions relating to [its] pre-emptive effect . . . ." Id. The first declares that, "[i]f a state law 'relates to employee benefit plans,' it is pre-empted." Id. at 45 (quoting 29 U.S.C. § 1144(a)) (internal brackets and ellipses omitted). Secondly, however, "[t]he saving clause excepts from the pre-emption clause laws that 'regulate insurance.'" Id. (quoting 29 U.S.C. § 1144(b)(2)(A)) (internal brackets omitted). Third, "[t]he deemer clause makes clear that a state law that 'purports to regulate insurance' cannot deem an employee benefit plan to be an insurance company." Id. (internal brackets omitted) (quoting 29 U.S.C. § 1144(b)(2)(B)). This clause "exempt[s] self-funded ERISA plans [distinguished from insurance-reliant plans] from state laws that 'regulate insurance' within the meaning of the saving clause." FMC Corp. v. Holliday, 498 U.S. 52, 61 (1990).

Neither party makes a case that ERISA preempts § 58-3-30.
Plaintiff primarily argues that the Court should define "accident"
via a "plain-meaning" analysis, but alternatively contends that
ERISA fails to preempt § 58-3-30, because: (1) § 58-3-30 regulates
insurance (and thus falls under ERISA's saving clause); and (2) the
policies arose from an insured rather than a self-funded plan (such
that ERISA's deemer clause does not apply). (Docket Entry 21 at
14-15 (citing Bailey v. Metropolitan Life Ins. Co., No. 2:96CV719,
1997 U.S. Dist. LEXIS 19480 (M.D.N.C. Oct. 3, 1997)
(unpublished)).)[12] In response, Defendant offers this statement:

> Arguably, N.C. Gen. Stat. § 58-3-30 is preempted by
> ERISA, as it is unclear whether that statute
> substantially affects the risk pooling arrangement
> between insurers and insureds. See Kentucky Ass'n of
> Health Plans, Inc. v. Miller, 538 U.S. 329, 338 (2003).
> Plaintiff's conclusory statement that § 58-3-30 is not
> preempted is based on an old standard and entitled to no
> weight. Regardless, because the Policy and [Defendant's]
> claim decision are in accord with the statute, the
> preemption analysis is unnecessary in this case.

(Docket Entry 24 at 9 n.6 (parallel citation omitted) (emphasis
added).)

Such equivocal remarks do not present a colorable argument
that ERISA preempts § 58-3-30. See White Tail Park, Inc. v.
Stroube, 413 F.3d 451, 462 (4th Cir. 2005) ("To the extent [the
plaintiff] argues the violation of its 'right to privacy' or a

---

[12] Another of Plaintiff's briefs mistakenly cites the first
party in Bailey as "Baker." (See Docket Entry 22 at 18.)

liberty interest under the Fourteenth Amendment, it has failed to develop that argument. Accordingly, we affirm the order of the district court dismissing [the plaintiff's] claims . . . ."); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way . . . . [A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); Nickelson v. Astrue, No. 1:07CV783, 2009 WL 2243626, at *2 n.1 (M.D.N.C. July 27, 2009) (unpublished) ("[A]s [the plaintiff] failed to develop these arguments in his Brief, the court will not address them.").[13]

Moreover, a party asserting preemption bears the burden of persuasion. AT&T Corp. v. Public Util. Com'n of Tex., 373 F.3d 641, 645 (5th Cir. 2004) (citing Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 230 (3d Cir. 2001))); accord Williams v. National Football League, 582 F.3d 863, 880 (8th Cir. 2009). Defendant has failed to carry this burden because it has offered only a conclusory suggestion that § 58-3-30 might fall outside ERISA's

---

[13] The portion of Kentucky Ass'n adverted to by Defendant alters the test for whether a state law "regulate[s] insurance" for purposes of ERISA's saving clause (by focusing on the state law's affect on risk pool arrangements). In denying that ERISA preempted § 58-3-30, Plaintiff cited a case decided before Kentucky Ass'n (hence, the objection that she relied "on an old standard"). Because Defendant has failed to develop any argument to support its equivocal suggestion that § 58-3-30 might fall outside the saving clause, the Court declines to discuss these matters further.

saving clause.  Given the absence of any showing of preemption, the

Court must look to § 58-3-30 to fix the definition of "accident" in

the policies at issue in this case.  See FMC Corp., 498 U.S. at 61.

The Meaning of "Accident" under N.C. Gen. Stat. § 58-3-30

Under North Carolina law, the term "'Accident' . . . shall be

defined to imply 'result' language and shall not include words that

establish an accidental means test."  N.C. Gen. Stat. § 58-3-30(b).

Said statute, however, does not identify the "'result' language" to

which it makes reference.  See id.  Neither have the parties cited

nor has the Court located any North Carolina state court decisions

explicating the term "'result' language" under § 58-3-30.[14]

Fifteen years ago, however, in a case with tragically similar

facts (i.e., an intoxicated insured's death as the driver in a

single-car crash), this Court (per Judge William L. Osteen, Sr.)

examined that aspect of § 58-3-30 and explained that:

> under a results test, if death is the unanticipated and
> unexpected result of an intentional, voluntary act, then
> the death is an accident.  46 C.J.S. Ins. § 863 at 4-6
> (1993); 10 Couch on Insurance 2d § 41:29, at 1, 2 (1982).
> The focus is on the unexpected consequences of voluntary
> and intentional behavior, rather than on the means.

---

[14] In construing § 58-3-30, this Court "must rule as the North
Carolina courts would, treating decisions of the Supreme Court of
North Carolina as binding, and departing from an intermediate
[state appellate] court's fully reasoned holding as to state law
only if convinced that the state's highest court would not follow
that holding."  Iodice v. United States, 289 F.3d 270, 275 (4th
Cir. 2002) (internal brackets and quotation marks omitted).

Bailey, 1997 U.S. Dist. LEXIS 19480, at *15 (emphasis added). By way of contrast, Judge Osteen, Sr. observed that:

> Under an <u>accidental means test</u>, a death is not an accident if it is caused by an insured's intentional act or is a foreseeable consequence of an insured's voluntary act. *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1085 (1st Cir. 1990). "According to this interpretation, if the act proximately leading to injury is intentional, then so is the result, even if the result itself was neither intended nor expected." *Id.* The focus is on the means that produce the result, rather than on the result itself.

Bailey, 1997 U.S. Dist. LEXIS 19480, at *14-15 (emphasis added).

Given these definitions, Judge Osteen, Sr. determined that the defendant "violated § 58-3-30 in ruling that [the insured's] death was not an accident under the terms of the Plan," <u>id.</u> at *13,

> [by] analyz[ing] [the beneficiary's] claim in the following manner: [The insured] voluntarily and intentionally consumed alcohol and became intoxicated; he then voluntarily and intentionally drove his pick-up truck while intoxicated; death is a reasonably foreseeable result of driving while intoxicated; [the insured's] intoxication and driving while intoxicated caused his death; thus, accident was not the "sole cause" of death as is required under the Plan.

<u>Id.</u> at *15. According to Judge Osteen, Sr.: "This is precisely the type of test that is proscribed by § 58-3-30 . . . [because it] focused on the voluntary and intentional nature and foreseeable consequences of [the insured's] acts, instead of focusing on whether he anticipated or expected the ultimate consequences of his voluntary and intentional acts." <u>Id.</u> at *15-16.

After determining that the administrator failed to apply an "accidental result" test required by § 58-3-30, however, Judge Osteen, Sr. declined to evaluate the facts under the proper standard to decide if an "accident" had occurred (or to remand the matter to the administrator for it to do so, as he might have done given that the plan in that case reserved decision-making discretion for the administrator); instead, Judge Osteen, Sr. concluded that, even if the crash constituted an "accident" otherwise triggering benefits, the administrator had the right to refuse payment based on the policy's separate exclusion for losses "caused or contributed to by . . . injuring oneself on purpose," id. at *3. See id. at 16 ("[T]he court need not address whether [the insured's] death was an 'accident' under § 58-3-30 because the court finds that [the administrator] acted reasonably in finding that [the insured] injured himself on purpose, which is an exclusion under the Plan.").[15] Given the lack of such an exclusion in this case, this Court now must confront the question left open in Bailey, i.e., did the instant intoxicated insured's single-car crash (which resulted in his loss of life) constitute an "accident" under the "accidental result" test required by § 58-3-30.

_____

[15] Because the plan in Bailey granted the administrator discretion to make benefits decisions, Judge Osteen, Sr. applied abuse of discretion, rather than de novo, review (and thus focused on the reasonableness not the correctness of the determination).

Moreover, because the parties have filed cross-motions for summary judgment, the Court must address this question from two different perspectives:

> When faced with cross-motions for summary judgment, the [C]ourt must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law. When considering each individual motion, the [C]ourt must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.

Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal citations and quotation marks omitted)); accord, e.g., Boggs v. Merck & Co., 84 Fed. Appx. 270, 271 (4th Cir. 2003) (following Rossignol in ERISA case); HealthSouth Rehab. Hosp. v. American Nat'l Red Cross, 101 F.3d 1005, 1008 (4th Cir. 1996) (observing, in ERISA case, that summary judgment movant "must negate any material issue of fact" and "court must construe all inferences and ambiguities in favor of the nonmoving party"); Weaver v. Phoenix Home Life Mut. Ins. Co., 990 F.2d 154, 157 (4th Cir. 1993) (same); Robinson v. AIG Life Ins. Co., 725 F. Supp. 2d 564, 566, 572 (E.D. Va. 2010) (following Rossignol in ERISA case); Piepenhagen v. Old Dominion Freight Line, Inc. Emp. Benefits Plan, 640 F. Supp. 2d 778, 784 (W.D. Va. 2009) (same), aff'd, 395 Fed. Appx. 950 (4th Cir. 2010); Williams v. Metropolitan Life Ins. Co., Inc., 632 F. Supp. 2d 525, 537 (E.D.N.C. 2008) (describing summary judgment standard in ERISA case, in relevant part, as follows: "[T]he court

must view the evidence and the inferences drawn from the evidence in the light most favorable to the nonmoving party. When considering cross-motions for summary judgment, a court evaluates each motion separately using the standard set forth above." (internal citations omitted)); <u>Harvey v. Astra Merck Inc. Long Term Disability Plan</u>, 348 F. Supp. 2d 536, 540 (M.D.N.C. 2004) (stating, in ERISA case, that, "[w]hen ruling on a summary judgment motion, the Court 'views the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences'" (internal brackets omitted) (quoting <u>Bailey v. Blue Cross & Blue Shield of Va.</u>, 67 F.3d 53, 56 (4th Cir. 1995), <u>abrogation in part on other grounds recognized by</u> <u>Carden v. Aetna Life Ins. Co.</u>, 559 F.3d 256, 260 (4th Cir. 2009))).[16]

---

[16] One federal appeals court has taken the position that "[t]he review utilized both by [a federal appeals] court and the district court in [an] ERISA case [like this one] differs in one important aspect from the review in an ordinary summary judgment case." <u>Orndorf v. Paul Revere Life Ins. Co.</u>, 404 F.3d 510, 517 (1st Cir. 2005). Specifically, according to the First Circuit, "in an ERISA case where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to [an award of benefits] to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue. This means the non-moving party is not entitled to the usual inferences in its favor." <u>Id.</u> (internal citation omitted). This statement appears to conflict with the First Circuit's own prior precedent. <u>See</u> <u>Allen v. Adage, Inc.</u>, 967 F.2d 695, 699 (1st Cir. 1992) ("We subject the district court's summary judgment to plenary review, taking the record in the light most congenial to the nonmovants and indulging all reasonable inferences in their favor. This standard applies unreservedly in the ERISA context." (internal citation omitted)). Moreover, another federal appeals court has rejected the First
(continued...)

<u>Plaintiff's Summary Judgment Motion</u>

According to Plaintiff, "[s]ummary judgment [in her favor] is appropriate in this case because Mr. Johnson's death is a covered accident under a correct interpretation of the [p]olic[ies]." (Docket Entry 21 at 5.)  Because Plaintiff seeks benefits under the policies, "the burden lies on [her] in the first instance to prove that the loss is a 'Covered Loss' under the polic[ies]," <u>Simpson v. Chambers</u>, No. 93-2462, 37 F.3d 1495 (table), 1994 WL 567901, at *2 (4th Cir. Oct. 18, 1994) (unpublished); <u>see also</u> <u>Gallagher v. Reliance Std. Life Ins. Co.</u>, 305 F.3d 264, 270-76 (4th Cir. 2002) (indicating that claimant bears burden of showing entitlement to ERISA plan benefits); <u>Clark v. Metropolitan Life Ins. Co.</u>, 369 F. Supp. 2d 770, 780 (E.D. Va. 2005) ("[T]he burden is on the claimant to show that the death resulted from an accident . . . .").  As the policies at issue cover only losses resulting from "accidents," Plaintiff thus has the burden of proving that the crash in which her husband died qualified as an "accident."  Moreover, given that § 58-3-30 incorporates into the policies a definition of "accident" based on the "accidental result" approach, Plaintiff must prove

---

[16](...continued)
Circuit's foregoing ruling in <u>Orndorf</u>.  <u>See</u> <u>Patton v. MFS/Sun Life Fin. Distribs., Inc.</u>, 480 F.3d 478, 484 n.3 (7th Cir. 2007).  Under these circumstances and in light of the above-cited decisions from the Fourth Circuit and district courts in the Fourth Circuit applying established summary judgment review standards in ERISA cases, this Court will not follow <u>Orndorf</u>.

that the crash was "unanticipated and unexpected," <u>Bailey</u>, 1997 U.S. Dist. LEXIS 19480, at *15.

In support of her summary judgment motion, Plaintiff fails to point to any evidence in the record that would support such a finding, let alone such evidence that, when taken in the light most favorable to Defendant, would entitle Plaintiff to judgment as a matter of law on that point. Instead of identifying evidence that would show Mr. Johnson did not anticipate or expect to crash, Plaintiff makes a conclusory assertion, conflates the alleged "accident" (i.e., the car crash) with the resulting "loss" (i.e., Mr. Johnson's loss of life), and attempts to shift the burden of proof, as follows: "The evidence in the record demonstrates that Mr. Johnson's death was an accident the [sic] plain meaning of the term. There is no evidence whatsoever that Mr. Johnson intended to bring about his own death, nor is there any evidence that he actually foresaw what would occur." (Docket Entry 21 at 9.)

Because, at a minimum, Plaintiff has the burden of proving that Mr. Johnson <u>did not</u> anticipate or expect to crash, Plaintiff lacks any entitlement to judgment, let alone summary judgment, based on the alleged absence of evidence that Mr. Johnson <u>did</u> anticipate or expect to die or, more accurately, to crash. At best, that approach would leave the case at equipoise, i.e., with no evidence one way or the other about what Mr. Johnson anticipated or expected and, as a result, Plaintiff's summary judgment motion

must fail.  See, e.g., Askanase v. Fatjo, Civil No. H-91-3140, 1993 WL 208440, at *7 (S.D. Tex. Apr. 22, 1993) (unpublished) ("[T]he evidence on the issue [in question] is in equipoise.  Because [the plaintiff] bears the burden of proof, and the controverted evidence must be viewed and all reasonable doubts must be resolved in favor of [the defendant], summary judgment is not warranted.").

Examination of another element of Plaintiff's claim illustrates this point.  As Plaintiff notes, the policies at issue require her to show that "the loss occur[red] within 90 days from the date of the accident" (Docket Entry 21 at 8 (internal quotation marks omitted)), but Defendant "does not dispute that the loss, Mr. Johnson's death, occurred within 90 days from the date of the accident" (id.).  If, however, Defendant had refused to concede this issue, could Plaintiff secure summary judgment without pointing to evidence that the loss occurred within 90 days of the crash?  Could Plaintiff demonstrate an entitlement to judgment as a matter of law simply by arguing that "there is no evidence whatsoever" that the loss occurred other than 90 days after the crash?  The answer to these questions is no, because Plaintiff has the burden of proof as to that element of her claim.

Similarly, Plaintiff cannot obtain judgment, much less summary judgment, by citing an alleged lack of evidence as to what her husband did anticipate or expect because, under her own theory of the case, she has the burden of proving that he did not anticipate

or expect to crash.  Only upon Plaintiff's identification of record evidence that supported the view that Mr. Johnson did not anticipate or expect to crash would the alleged absence of contrary evidence become important.  In sum, because Plaintiff has failed to point to any evidence that would establish what her husband expected or anticipated when he drove a vehicle down a highway at an unlawful speed while severely intoxicated, Plaintiff cannot secure summary judgment on her claim that the loss at issue (i.e., her husband's loss of life) resulted from an "accident" (i.e., an "unexpected or unanticipated" crash).  As a result, the Court will deny Plaintiff's summary judgment motion.

Defendant's Summary Judgment Motion

Defendant seeks summary judgment principally on the theory that, "[i]n light of the well established federal common law specifically adopted by the Fourth Circuit, a motorist's death resulting from an intentional, reckless decision to operate a motor vehicle after consuming excessive amounts of alcohol is not an 'accident' as a matter of law."  (Docket Entry 19 at 10.)  In this regard, Defendant relies primarily on the Fourth Circuit's decision in Eckelberry.  (Docket Entry 19 at 12-18 (discussing Eckelberry at length and stating "[t]his case is controlled by and factually indistinguishable from Eckelberry").)  For reasons that follow, the Court declines to treat Eckelberry as dispositive of this case.

In <u>Eckelberry</u>, an ERISA-governed policy afforded benefits if the insured suffered death or a specified injury due to an "accident" (which the policy defined as something "'unexpected' and [which] 'the insured does not foresee'"). <u>Id.</u> at 342. It "also provided that '[the administrator] ha[d] final discretionary authority to determine all questions of eligibility and status and to interpret and construe the terms of th[e] policy(ies) of insurance.'" <u>Id.</u> A policy beneficiary sought recovery when an insured "died after his vehicle crashed into the back of a parked tractor trailer." <u>Id.</u> at 341-42.

The administrator denied benefits, "reason[ing] that because [the insured's] blood-alcohol level was 50 percent higher than the legal limit, he knowingly put himself at risk for serious injury or death, and his injuries were therefore not 'unexpected.'" <u>Id.</u> at 342. The beneficiary sued to overturn that decision, "argu[ing] that [the] denial of benefits was unreasonable because, viewed subjectively, [the insured] did not expect to crash, and because serious injury was not 'highly likely.' The district court agreed . . . and grant[ed] [the beneficiary's] motion for summary judgment." <u>Id.</u> The Fourth Circuit, however, reversed the district court "[b]ecause [it] conclude[d] that [the administrator's] interpretation of 'accident' was not unreasonable . . . ." <u>Id.</u>

In so doing, the Fourth Circuit emphasized that, given the abuse of discretion standard applicable to judicial review of the

administrator's decision (due to the reservation of discretion), it would "not search for the best interpretation of [the] plan or even for one [the Fourth Circuit] might independently adopt." Id. at 343. Instead, it would leave standing "any reasonable interpretation," id. The Fourth Circuit then turned to the term "unexpected," which it noted was undefined by the policy and, like the term "accident" itself, "not always susceptible to easy application," id. According to the Fourth Circuit, because of this difficulty, "many federal courts have adopted the framework laid out in *Wickman*, to clarify the meaning of 'unexpected.'" Id. (internal citation omitted).

The Fourth Circuit explained Wickman's methodology as follows:

Initially, the court asks whether the insured subjectively expected his actions to result in injury or death. If the insured "did not expect an injury," the fact-finder must "examine whether the suppositions which underlay that expectation were reasonable" and must do so "from the perspective of the insured." However, "if the fact-finder, in attempting to accurately determine the insured's actual expectation, finds the evidence insufficient to accurately determine the insured's subjective expectation, the fact-finder should then engage in an objective analysis of the insured's expectations." This "objective analysis" asks "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct."

Id. (internal citations omitted) (quoting Wickman, 908 F.2d at 1088). After noting that in a prior case (Baker v. Provident Life & Accident Ins. Co., 171 F.3d 939, 942-43 (4th Cir. 1999)) the

Fourth Circuit had "suggested that it would apply *Wickman*'s test to drunk driving collisions," the Fourth Circuit proceeded to apply Wickman to the case before it.  Id. at 343-44.

At the initial Wickman step, the Fourth Circuit determined "there [wa]s no evidence in the administrative record from which 'the insured's subjective expectation' can be 'accurately determined.'"  Id. at 344 (quoting Wickman, 908 F.2d at 1088).  As a result, it "proceed[ed] to the 'objective analysis,' and consider[ed] 'whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct.'"  Id. (quoting Wickman, 908 F.2d at 1088). In conducting that analysis, the Fourth Circuit took particular note of the degree to which the insured's blood-alcohol level exceeded the legal limit (i.e., by 50%), the substantial, graduated criminal penalties for drunk-driving, and the analogy between driving drunk and playing Russian Roulette.  See id. at 345-46.

Ultimately, the Fourth Circuit arrived at these conclusions:

> In sum, we are hard-pressed to say that a death must be deemed accidental where a decedent voluntarily gets behind the wheel after voluntarily drinking too much. By choosing to drive under circumstances where his vision, motor control, and judgment were likely to be impaired, the insured placed himself and fellow motorists in harm's way.  To characterize harm flowing from such behavior as merely "accidental" diminishes the personal responsibility that state laws and the rules of the road require.  This case, in short, affords us no basis for

concluding that [the administrator's] denial of benefits was <u>unreasonable</u>.

. . . .

We do not suggest that plan administrators can routinely deny coverage to insureds who engage in purely negligent conduct or, for example, to anyone that speeds. . . . [A] comparison of those who drive drunk to those who apply lipstick, fiddle with the radio dial, or restrain a child is inapt.  While these actions are hardly commendable driving habits, they do not generally rise to the level of crimes.  Indeed, even though acts like speeding and (in some jurisdictions) driving while talking on a cellular phone are illegal, none compare to driving while drunk, which has long been widely known and widely publicized to be both illegal and highly dangerous.

<u>Although some courts have suggested that car crashes caused by drunk driving can never be accidents, we cannot anticipate every future set of circumstances and do not adopt a per se rule</u>. . . . Here, however, the undisputed facts presented to the Plan administrator <u>go a long way toward establishing</u> that the insured's death was not accidental.

We in no sense intend to make light of the loss that plaintiff has suffered.  We simply confirm as a matter of law that the Plan administrator's ruling was a <u>reasonable</u> one under the policy as written.  The insured's conduct went beyond the careless and imprudent.  Under the circumstances here, we think it was <u>reasonable</u> for [the Plan administrator] to conclude that because the insured put himself in a position in which he should have known serious injury or death could occur his death was not unexpected.

<u>Id.</u> at 346-47 (emphasis added) (internal citations and quotation marks omitted).

Strictly speaking, <u>Eckelberry</u> thus does not directly and/or conclusively answer the question presented in this case, i.e., whether Mr. Johnson's crash (which resulted in his loss of life)

failed to constitute an "accident" under the "accidental result" test required by § 58-3-30, because it was not an "unanticipated and unexpected result," Bailey, 1997 U.S. Dist. LEXIS 19480, at *15. Specifically, Eckelberry establishes that, in the absence of some unusual circumstance, the term "accident" (defined as an "unexpected" event) reasonably may be construed as failing to encompass a situation where a drunk driver crashes a car, but Eckelberry does not pronounce that construction the only plausible one, because that case came before the federal courts for abuse of discretion, rather than de novo, review (due to the underlying plan's reservation of discretion for the administrator). See Eckelberry, 469 F.3d at 346-47; see also id. at 343 (noting that applicable review did not require determination of "best interpretation of" the term "accident" under the plan "or even one [the Fourth Circuit] might independently adopt").

Given that the de novo standard applies in this case and that § 58-3-30 controls, this Court must take the further and different step of deciding whether North Carolina courts would conclude that the term "accident," when viewed as adopting an "accidental result" test pursuant to the mandate in § 58-3-30, stretches far enough to reach Mr. Johnson's crash. On the record of this case (and without reference to the Wickman test), this Court says no.

As Judge Osteen, Sr. explained, the "accidental result" standard required by § 58-3-30 defines an "accident" as an

"unanticipated and unexpected result of an intentional, voluntary act," Bailey, 1997 U.S. Dist. LEXIS 19480, at *15. Where (as here) an individual with an intoxication level approaching four times the legal limit drives a car down a highway 30% above the speed limit, a crash is in no commonly understood sense an "unanticipated and unexpected result," id., unless some unusual circumstance (absent here) would make it so. In other words, given the undisputed record evidence that such extreme intoxication causes "[d]isorientation, mental confusion [and] dizziness[,] . . . [d]isturbances of vision . . . and of perception of color, form, motion, [and] dimensions[,] . . . [i]ncreased [or marked] muscular incoordination[,] . . . [a]pathy [and] lethargy . . . approaching loss of motor functions[,] . . . [m]arkedly decreased response to stimuli[, and] . . . sleep or stupor" (AR 277-78), a crash by a driver so impaired while unlawfully speeding down a highway constitutes an anticipated and expected result (and thus not an "accident" within the meaning of § 58-3-30, again barring some unique consideration not shown to exist in this case).[17]

---

[17] Indeed, the record establishes that, even at approximately half the level of intoxication as Mr. Johnson had, "[t]he predictable effect on driving is substantial impairment in vehicle control, attention to driving task, and in necessary visual and auditory information processing" (AR 68) and that, as the level of intoxication "increases, the degree of impairment also rises dramatically" (AR 80 (emphasis added)). These considerations make a crash by a speeding driver in Mr. Johnson's condition as much an anticipated and expected result as a bullet hitting the head of someone who chooses to play Russian Roulette.

To avoid this conclusion, Plaintiff urges the Court: (1) to construe "accident" under Mr. Johnson's policies as "something bad that happens, unexpectedly, without the intention of the actor" (Docket Entry 22 at 9); and (2) to refrain from "focus[ing] only on the 'unexpected' portion of that definition" (id.). Moreover, Plaintiff asserts that she, not Defendant, should prevail as a matter of law under her suggested approach because "[t]here is no evidence, whatsoever, Mr. Johnson planned or intended the car accident. Presumably, he did not want to die." (Id.) For at least two reasons, this line of argument cannot save Plaintiff's claim from the entry of summary judgment in Defendant's favor.

First, "[s]uch a standard critically changes the meaning of the word 'accident.' Following such reasoning, any action short of [attempted] suicide would have to be deemed an accident." <u>Mullaney v. Aetna U.S. Healthcare</u>, 103 F. Supp. 2d 486, 492 (D.R.I. 2000) (upholding, on de novo review, denial of ERISA-covered benefits for accidental death where insured with alcohol-intoxication over three times legal limit crashed into tree while speeding). Plaintiff cited no authority for such a proposition and the Court found none.

Second, Plaintiff's formulation would impose a burden on Defendant to prove what Mr. Johnson expected or anticipated regarding the prospect of a crash when, in fact, that burden lies with Plaintiff. <u>See</u> <u>Gallagher</u>, 305 F.3d at 270-76; <u>Simpson</u>, 1994 WL 567901, at *2; <u>Clark</u>, 369 F. Supp. 2d at 780. Moreover,

-33-

Plaintiff's discussion in this regard (like her brief in support of her own summary judgment motion (Docket Entry 21)) lacks any citation of any record evidence that, on the night in question, Mr. Johnson did not anticipate or expect a crash to result from his act of speeding down a highway while extremely intoxicated. (See Docket Entry 22 at 9.) Nor does Plaintiff's argument in this regard offer any citation of authority for the assertion that the Court should presume what state-of-mind Mr. Johnson had. (See id.)

In the face of Defendant's summary judgment motion, Plaintiff's failure to identify record evidence on a matter as to which she bears the burden of proof warrants entry of summary judgment in Defendant's favor. See, e.g., Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008) ("The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986))); Carr v. Deeds, 453 F.3d 593, 608 (4th Cir. 2006) ("[T]here is no burden upon 'the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact.' Rather, 'the burden on the moving party may be discharged by "showing" – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" (quoting Celotex Corp. v. Catrett, 477

-34-

U.S. 317, 325 (1986)) (internal emphasis omitted)); <u>Francis v.</u>
<u>Booz, Allen & Hamilton, Inc.</u>, 452 F.3d 299, 308 (4th Cir. 2006)
("Mere unsupported speculation is not sufficient to defeat a
summary judgment motion if the undisputed evidence indicates that
the other party should win as a matter of law.").

As a final matter, Plaintiff contends that a failure to
include Mr. Johnson's crash within the confines of the term
"accident" as used in these policies "makes parts of the same
[p]olic[ies] contradictory or would require the Court to ignore or
construe certain terms [in the policies] as meaningless." (Docket
Entry 22 at 10.) Specifically, Plaintiff asserts that:

> [Defendant] agreed to pay "an additional accidental death
> benefit, called the Seat Belt Benefit, if [Mr. Johnson]
> die[d] as a result of an Automobile accident while
> properly wearing a Seat Belt." However, this Seat Belt
> Benefit is subject to the explicit limitation that it
> "will not be paid if [Mr. Johnson], while operating the
> Automobile, was legally intoxicated as defined by
> applicable laws during the event." The only useful
> purpose that limitation can serve is to restrict what
> Automobile accidents will lead to payment of the benefit.
> If such events were not even "accidents" under the
> polic[ies] to begin with, then there would be no need to
> exclude them from the benefit because the benefit applies
> only to "accidents."

(<u>Id.</u> (quoting AR 178) (internal brackets, citations, and ellipses
omitted.)

This argument lacks merit because, by concluding that the term
"accident" (within the meaning of § 58-3-30) fails to encompass Mr.
Johnson's crash, the Court has not construed "accident" to exclude

every crash involving a driver with an intoxication level over the legal limit. To the contrary, the Court's conclusion about Plaintiff's failure to carry her burden of showing that said crash constituted an "accident" applies only to the undisputed facts of this case. On another record, e.g., one involving a driver with a lower intoxication level that nonetheless exceeded the legal limit, a car crash might fall within the definition of "accident" under § 58-3-30, such that the seat belt benefit's legal intoxication limitation would retain independent significance.[18]

## CONCLUSION

Plaintiff has not shown a basis in the record for a finding that the crash that resulted in her husband's death qualifies as an "accident" pursuant to the standards set by § 58-3-30 (which became a part of the policies under which she seeks benefits).

---

[18] Plaintiff further asserts that the existence of the legal intoxication limitation as to the seat belt benefit "also shows that, had [Defendant] desired to exclude coverage for accidents during . . . legal intoxication, it knew how, and was able to do so." (Docket Entry 22 at 10-11.) "In essence, [P]laintiff contends that [D]efendant's failure to specifically exclude death resulting from driving while intoxicated [from benefits generally] implies that such an occurrence is covered . . . . That reasoning is faulty. . . . Exclusion clauses limit the scope of the coverage granted, but they do not in and of themselves grant coverage. Thus, failure to exclude an act from coverage does not automatically mean that the act is covered by the policy." Mullaney, 103 F. Supp. 2d at 494-95; accord Riddle v. Life Ins. Co. of N. Am., Civil Action No. 11-1034(FLW), 2011 WL 4809037, at *7 (D.N.J. Oct. 11, 2011) (unpublished).

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment (Docket Entry 20) is **DENIED** and that Defendant's Motion for Summary Judgment (Docket Entry 18) is **GRANTED.**


/s/ L. Patrick Auld
_____
**L. Patrick Auld**
**United States Magistrate Judge**

March 12, 2012